Appeal 2007-1448. Mr. Phillips, good morning. Welcome. Please proceed. Good morning, Your Honors. The employees of the Court. I want to begin by looking specifically at the inequitable conduct determination by the District Court. It is, in its nature, a quite provocative set of findings and, frankly, one that is both clearly erroneous and otherwise undermined by mistakes of law and cannot withstand candidly serious scrutiny. The District Court analyzed this case as if there was a rather substantial conspiracy among four quite reputable law firms. And in making that determination, it was very critical to his analysis that he says, and this is with respect to the quarantine portion of the opinion, and this is on A-26 and then he comes back to it on A-27, to me the linchpin of the District Court's analysis, that it is the isolation of the Banner firm, that's the recipient firm, remember we start off with the first firm and then it goes to the Banner firm. The isolation of the Banner firm from predecessor counsel was part of an intentional effort to avoid tainting the Banner firm with Del Mendo's knowledge, whatever concerns he may have had about this particular letter, the Burton letter. And then subsequently, the district judge also says the court finds that had Starr not prevented contact between Del Mendo and Rivard, Del Mendo would have communicated his knowledge and all of this information. So there is this finding, or at least statement, of this nefarious conduct in the relationship between these parties. And your view is that there's no direct evidence to support either of those findings? Not only no direct evidence to support them, but there is categorical and uncontested evidence that that finding is flatly wrong. And there you look at A-373 of the Joint Appendix. It's Dale Hochheit's testimony, he is a senior partner at the Banner firm, he was the partner responsible for receiving the materials. And I would commend that language to the court, I'll read a bit of it here. I met with Sugru, the other firm. More particularly, I met with Frank Osha, Mark Boland, and Mr. Del Mendo. And we knew each other. We litigated together. And we spoke about the case, and they sent us the files, and as we all know, inside of those files is the precise letter, the Burton letter, that is allegedly the source of the concerns here. So that this entire analysis, predicated on the assumption that there is somehow a nefarious conspiracy going on here, is just complete fabrication. There is no evidence that supports it. And yet it is the critical element for the district court to have found any intent. Because otherwise, there's simply no motive. We have a letter that the initial firm looked at, concluded wasn't material. The letter is conveyed to the second firm in circumstances that are utterly unobjectionable or otherwise even raise any eyebrows, at least in my experience in handing off cases from one law firm to another. Mr. Phillips, let me ask you, with respect to this intent issue, which is what you're focusing on, did the judge make specific credibility findings? In other words, did he say, I don't believe Mr. X, or anything like that? No. He has some credibility question in his mind. I think there is some element of what Mr. Williams may have testified with respect to the provisional application. Oh, the Brazil issue. Right. But with respect to this point, which is absolutely the critical point, where if you were going to make a credibility finding, it would have to be with respect to Dale Hochheim. Because he is the pivot for this entire handoff. He was the one, the discussions with Mr. Rivard in June of 2002, presumably, where the decision was made not to file a new disclosure statement. Right. That's a separate set of issues. But with respect to what this pivotal event, in terms of handing over the files, and what happened in trying to suppress whatever doubts may have existed in the Sugru firm as the matter came over, on that, Dale Hochheim's name is never mentioned in the district court's opinion. I guess the question of how you view this depends to a large extent on whether you view the material that wasn't disclosed as being highly material or not. In other words, whether there was really a motive to conceal it. Right. And I read you as saying that, to a large extent, the first memorandum in the Jennings and the current data was cumulative of what was already disclosed to the commission, to the PTO. That's true. And I guess I'm wondering about that. If you put aside the Peel reference, and I have another question about that, but put aside the Peel reference for a moment. If I read the record, there were no numbers that were given as to the low level of carcinogens in the prior arc flu curing process. True. True? Right. Yes. And was there any statement in the disclosures, other than the Peel reference, that the prior arc produced low levels of nitrates? No, what it says is that there's a relative, it does produce relatively lower, is the specific statement in the application itself. Instead of putting in the Jennings data, the application says you get somewhat reduced. But does it use the word low, or just uses the word reduced? Reduced. Somewhat reduced. Okay. So, but it seems to me that under those circumstances, that seeing actual numbers with very low levels, or seeing the Burton memorandum with no levels in the Chinese experience, is not cumulative of what was disclosed. Well, except, I mean, I do think it's a little difficult to say that with respect to the Peel application, because Peel... Well, I'm trying to find Peel, but... But, I mean, that's one where, you know, from the perspective of the ordinary prosecuting lawyer who's looking at this problem, I mean, he's got the Peel application in mind, he's readily revealed it. It shows numbers in the sort of one to two range, which again, from our perspective, is obviously lower than what you get in the ordinary course, but nowhere near the levels you get under the inventions that are issued. Yeah, but just put aside Peel for one moment. Isn't it hard to say that if you put aside Peel, that the disclosures simply said that you could achieve a reduced level under the prior art, and that Burton and Jennings and Curran, and I understand your objections to Curran, but added something to that. They weren't merely cumulative of the notion that you got reduced level. Well, I think they don't add much. I mean, and cumulativeness is not the only objection to Burton. I mean, remember, they went back to Burton, they asked him about it, they said, what do you really know? And he said, one, I don't know anything about flu curing, so it's not this kind of tobacco. I don't know how they do it in China. I don't know how they got it in China. So the truth is, there are lots of reasons over and above the fact that it happened to be cumulative of other disclosures in there for why you wouldn't, if you just looked at that letter, say to yourself, okay, this is something that I absolutely have to put in the file. And the truth is, and if you go back to it and you look at it on the back end, when they had it in hand, when it had been disclosed to R.J. Reynolds, and you have three very experienced, very thoughtful lawyers look at that letter specifically in mind, do we disclose it now after the check has been issued? After the check has been written in order to take it off the table, and all three of them came to exactly the same conclusion, which is no, it's not reasonable under these circumstances to disclose it because it's unreliable, it's cumulative, and candidly, it's the musings of less than a 24-hour deliberation from a professor who's just sort of explaining generally what's going on here. There's kind of a randomness to this whole discussion of Chinese tobacco, and nobody knows what Chinese tobacco means in this particular context. I suppose you could argue that it would have been a misstep to give such misleading, ill-founded, speculative material to the patent office. It would be affirmatively misleading, and therefore it would be inequitable conduct if you gave them the Burton letter rather than being inequitable conduct if you withhold it. Well, I'm quite certain that Reynolds would probably have made that particular argument, but the more fundamental point, which is embedded in your comment, Chief Judge Michel, is that obviously there's not a uniform, one-sided rule that says disclose all information that could, under any circumstances, be thought relevant. I mean, the standard is a standard of materiality, and is it going to affect how the examiner looks at this particular information? And we know, coming out of the 401 patent, the 401 patent, by the time that got around, there was plenty of evidence that you could use indirect heating methods and end up with numbers that were substantially lower than you would otherwise get, but still nowhere near the kinds of numbers that were embedded in this invention. And that examiner approved the 401 patent without giving any serious thought to it. I mean, he gave it serious thought and scrutiny, but without any anxieties or concerns about that information somehow changing the assessment of what had gone in in the original application and whether he needed additional information under those circumstances. So it seems to me that, with respect to the inequitable conduct, the whole notion of intent, and I agree with you, Judge Dyke, obviously if this were highly material, that does affect the intent standard. But the district judge's specific findings with respect to intent is that there was this very nefarious, underhanded effort, grand conspiracy among four law firms to keep out a document which, candidly, is at best of marginal materiality. Could I bring you back for a moment to the Peale reference? Yes. Which I actually put aside earlier. That does disclose numbers and does suggest low levels of nitrates in the earlier fluke curing process. But the Peale reference is not prior art, if I understand correctly, to the 649 patent, right? Right. It came in post 649. So wouldn't that affect the question of whether it should be considered for deciding cumulativeness? I don't think so. I mean, technically you could say that with respect to cumulativeness, but I do think what's important is to recognize that when that application is put in front of the examiner who's looking at essentially the same set of specifications and largely the same claims and evaluates it against this particular data, it makes no difference to his analysis, which to my mind tells you precisely how material the burden evidence would have been since burden says nothing about any of those kinds of numbers and deals with a completely different situation. And candidly says nothing about airflow, which is a central element of this. I mean, remember, the absolute invention here, the genius, the discovery is the notion that airflow is critical. It's not the only variable, but it is the critical variable. That's what distinguishes the prior art. And there's not a word in burden about airflow because he didn't focus on that, certainly then, or I don't think even has ever really focused on it as the big ticket item. And a great deal of the way the district judge looks at this seems to be concerned about this heat exchange as the kind of sine qua non here, when in reality, while that's an element, and it is the way you get from 10 units of these nitrosamines down to 2 or 1.5, it is not the way you get down to 0.1. To do that, you need the airflow. And that's both what there's no evidence of any intent to deceive with respect to that. And also, candidly, that's why this is not indefinite because there are very specific findings by both the magistrate and the original district judge as to how those airflow operates against anaerobic conditions in a way that allows you to eliminate nitrosamines down to very specific numbers, which is candidly not even close to indefinite as this court interprets it in Exxon. What about its bearing on the issue of intent, the failure to disclose the Burton memorandum once it was discovered later? And there were recommendations by, I don't know, five lawyers or something to file an information disclosure statement that would refer to it. And then the decision was made not to. Right. The district judge doesn't deal with the good faith explanation that was put forward by the lawyers who made the decision. It seems to me in this context, we're talking about fraud. And the explanation was? Was that given that they would have a higher burden to withdraw the patent in order to put this on the table, that they would only do that if it were, in their judgment, clearly material. Not just relevant, but clearly material to the outcome. And because it was not based on any actual data, was in fact wrong, and at that point they already knew it was wrong, and certainly was fully consistent with what they'd already said with respect to Peel, so there was absolutely cumulative on that score, there was no point in disclosing it at that stage. And again, there's no intent here. Remember, they've already put Peel out there. R.J.'s already got this document. It's not as though there's some effort here to hide the ball. It's all out there. They just made a good faith determination that it didn't need to be disclosed at this point, because it wouldn't affect the outcome of the case. And on that score, to the extent the district court made a contrary finding, it didn't deal with the good faith explanation that the lawyers put forward under those circumstances. It certainly didn't say they had no credibility. It didn't attack their credibility. It didn't challenge it. If there's anything here that's an arguable negligence, maybe, but I'm frankly not even sure it's it. But there's nothing that comes anywhere near what this court described in DACO as that threshold showing of intent that's necessary in order to make a final comment. If there are no further questions, I'll reserve the balance of my time. All right. We'll restore the rebuttal time you sought to preserve. Mr. Kaplan? Thank you, Judge. Good morning, Your Honors. May it please the Court. The decision below should be affirmed on the inequitable conduct. Judge Garbus was well within his discretion to reach the conclusions that he did. He weighed the credibility. He assessed the demeanor of the witnesses. And for virtually every argument that Starr wants to raise at this point, there was countervailing evidence that the judge was in a position to assess. There's been no legal mistake that's been shown. Nothing is a matter of law that they point to that would constitute some form of reversible error. The findings have not been demonstrated to be clearly erroneous. In fact, they were substantially supported. Well, I understood him to be saying precisely that the critical finding on intent was clearly erroneous. So we better agree on what the position is and isn't or we can't have an intelligent discussion. Well, on intent, the judge was well within his discretion to conclude it. He said there was lots of intent. Intent has nothing to do with discretion. Discretion is a prerequisite, fact finding. And I understand Mr. Phillips to be saying wrong on intent, flat wrong, clear error. Of course, you don't agree, but that seems to be the issue. But now you're saying that isn't the issue, so I'm confused. Well, it is the issue. The issue was there was material information, there was highly material that was withheld and not disclosed, and was there deceptive intent? You can't get to intent just on the fact that they withheld the information. There has to be deceptive intent. And I think Judge Garvis littered throughout, sprinkled throughout his decision from beginning to end, makes serious findings about intent. What does he say about cumulativeness in relation to intent? He said that there was no disclosure in terms of this whole issue that sometimes you would get low TSA days. He's very clear from the beginning to the end that there's no disclosure of that. But what does he say about the disclosures that were made about a reduced level and the disclosure in the Peel reference? What does he say about those disclosures with reference to the issue of intent? I think the judge does not talk about Peel specifically. He does not talk about the interrogatory answer specifically. But he does say that the information withheld is highly material. Does he talk about the specification disclosure about reduced level? Yes, because he says that there is no disclosure. And I think to the extent that he says there was no disclosure to the Patent Office, he understood the argument about the specification that they're saying that they said there was a somewhat reduced. There was testimony from Dr. Otten, the technical expert, whose testimony was not contradicted or challenged by any other technical expert. Dr. Otten explained, reading this, that it was very clear when they said somewhat reduced, you have to read the whole paragraph. They left out part of the quote in their opening brief. Did their witnesses suggest that the reason for the nondisclosure is that it was regarded as cumulative? Well, they tried to suggest that at the end. Well, tried. Is that what they testified to? I think there was testimony from Mr. Del Mendo that he said that was put in there. But Judge Garbus pointed out that there really was no explanation for the change in the language. If you recall, in the provisional application, they had said instead of getting Lotea Sinese, they- But I'm not talking about the change of the language. I'm talking about when the nonprovisional application was filed. We have said in these cases that one of the important issues is whether there's a good faith explanation for nondisclosure. If I understand correctly, one of the things that the STARS witnesses said was that we had a good faith reason for not disclosing it because we thought it was cumulative. Am I mistaken about that? No, I think that's their argument. And that's what the testimony was, right? Right, and I think Judge Garbus addressed that and said that he didn't find credible or he didn't find even plausible the explanations that were provided. But does he talk about the cumulativeness explanation? I think when Judge Garbus talks about the high materiality, he does not need to specifically say- So the answer is he didn't specifically address that. The words are not there in black and white, yes. But I think clearly this was material. I mean, Mr. Rivard, the prosecuting attorney that really handled the book- Well, the question is not whether it's material or not right now. The question is they had an explanation that they said it wasn't material because they thought it was cumulative. And I would have thought that Judge Garbus would have addressed that explanation and found that it was either credible or incredible, but apparently didn't directly. Well, I think he did directly say that was not credible. He talks towards the back end of his decision where he runs through the sequence of events with the email string. And when the Burton letter was discovered, he goes through in a fair amount of detail about what actually happened when the Burton letter suddenly appeared after Reynolds uncovered it, having gone to Kentucky and through third-party discovery. And Judge Garbus walks through the sequence of events. And there were five lawyers who all looked at the Burton letter that said this should be disclosed. And then there's an email string, and Judge Garbus walks through that. And he makes what I think is a very important point that he says in the course of that email string there was only one attorney from the Kroll firm that says, after reading the sequence of events, he says, I want several of you and the Berner folks to go ahead and decide this. And I think he was reasonable to infer. He uses that as a springboard to get to the point that he doesn't think that there was an independent judgment that was exercised. He doesn't think there was good faith that was exercised. And he doesn't find the explanations plausible. But where does he say why not? When you say why not? Yeah, I mean, a fact finder can't just say, I don't believe any of the witnesses. Therefore, that party loses. You have to give reasons for disbelieving testimony. The main argument at the trial, for example, was they wanted to try and justify the nondisclosure. It would have been costly, or it would have caused delay. He specifically, in the back of his decision, rejects that. He says the cost and the delay issue was not a plausible response. And he has a finding in there that that was not plausible. You seem to be saying that even though he didn't say it, I think you put it in terms of in black and white, that his findings implicitly address and, in your view, demolish the materiality. I think it demolishes both materiality and intent. What finding are you relying on that inferentially kills the materiality point? Well, I think he's got a whole discussion about materiality, where he goes right to the point that there was no disclosure of the ability of the prior art to achieve loa tia sinensis. He makes an important discussion. You're not helping me. I want you to point me to text in the opinion that you say can only be interpreted as rejecting the defence that it wasn't material. When you say it's in there somewhere, I can't deal with that. Well, I can give you an example. On page A30, which is 29 of the decision, he says about two-thirds of the way down on the page, By so doing, council led the PTO to believe that the pertinent art consisted solely of publications and provided no hint, much less a candid disclosure, that there was prior art in the form of curing methods previously known and used in the United States. Yeah, but that's not really addressing the good faith of Starr when they didn't disclose it. The question is whether a reasonable person under the circumstances could have reasonably believed that this stuff was not material because it was cumulative. And the problem is, as I see it, that he doesn't really tell us that he's examined that good faith defence and found it to be implausible. Well, I think if we focus on starting at page A43 of his decision through A46, there's a whole discussion here about intended deceit that really goes to the issues in terms of, as well, materiality. For example, one of the things that you have not heard mentioned this morning is that, yes, there was a discussion between the lawyers after the Burton letter surfaced that included the Crow firm and the Banner firm. But one of the things that the judge made a point of showing, just as in the McKesson case, and he talks about this on A44, that they never documented, that they never recorded any reason or explanation for not making a disclosure. The judge pointed out that Mr. Rivard and Mr. Del Mendo both testified that they had a practice of erring on the side of disclosure, that it was a closed case, better to disclose than not to disclose. And the judge here, Judge Garbus, says that, you know, he's talking about the McKesson case, but he's talking about the Del Mendo and Rivard testimony, that their actions were totally inconsistent with the practice of bending over backwards to disclose prior art. And, in fact, that their inconsistency in terms of the way they dealt with this situation versus what they professed to say was completely inconsistent with complying with the duty of candor. And he talks about that at the bottom of A44 and A45. He talks about the McKesson point, which references the MPEP, that if you're going to take a decision, you know, you have this right in front of you in black and white, and you're going to make a judgment not to disclose, it would be a good practice to record that document and explain it. There was none of that at the trial. There's none of that in the evidence. And, in fact, the email string doesn't talk about, you know, reasons for not disclosing. It talks about reasons for disclosing. Everybody who commented said, let's disclose. And then Mr. McMillan in the email string says, after some people have said disclose, well, I want the group of you collectively to decide this. And I think that kind of brought things to a dead stop. Scott, let me ask you a question, if I could. The issue here we've been discussing is intent. Is it possible to find the requisite level of intent without implicating the attorneys? In other words, assume for the moment that one were to come to the conclusion that the attorneys in this case, starting with the Chagrou firm, through the Banner firm, through the Kroll firm, acted in good faith. Does that take away necessarily the determination of intent that is needed to support inequitable conduct? The answer to that is no. I think that the intent that the judge talks about from the inventor and the key executive, the star, Mr. Johnny Williams, sufficed on its own to- Yeah, but I mean, in his opinion, the intent issue is focused. It seems to me, and please correct me if I'm wrong, it seems to be very much focused on this conspiracy that began with the transfer of the documents from one firm to the other. Then what happened after there's a suggestion that, well, maybe the document was, maybe it wasn't in the file. Then it goes on to talk about what the lawyers did not do after the May-June 2002 period. So it seems to me that the intent finding here is very much dependent on the conduct of the attorneys, so that if one is to say that the attorneys did not act improperly, then there's a problem with the intent finding. I think Judge Garbus was very careful to talk about intent as starting with the inventor, Mr. Williams. He says, for example, on A43 that RJR has established the intent to deceive by Williams and others by clear and convincing evidence. The intent with Mr. Williams, Mr. Williams was the source. It's undisputed. Mr. Williams was the source of the statement. The suggestion, though, that the attorneys are, if you will, carrying forward this scheme or design or whatever you want to call it, so that if one says, okay, assuming that whatever Mr. Williams was or wasn't thinking, the attorneys came to the conclusion in good faith, if one were to conclude that, that there was no reason to turn this document over, then aren't we left with a hole in the intent finding? Well, I don't think so because Mr. Williams says, and the attorneys put in from day one, talks about high TSNAs when the letter says low. Judge Garbus talks about earlier in his decision the language change that was made when the non-provisional application was filed, and he says they danced around it and they were still not candid. But I think there was intent on the lawyers and the law firms, and he had a reasonable basis to reach that conclusion. Can I understand the facts a little bit better? Sure. It follows up on what Judge Schall was asking about. Who knew about the Burton letter before the notice of allowance? Who involved in this prosecution knew about it? Williams knew about it, right? Mr. Williams knew about it and Mr. Del Mendo knew about it. Anybody else? I think there's testimony that Starr's executives knew about it. There's a question they've argued that the Banner firm did not know about it, and Judge Garbus has talked about, well, highly suspicious, but he seemed willing to accept that Mr. Rivard hadn't seen it. Did Williams testify? Mr. Williams testified. What did he say about the nondisclosure of the Burton letter? He said he was the source of saying that, to say, to tell the Patent Office that you would get high TSNAs if you filed an indirect fire curing process, not low. And the only thing he could point to is he said, well, it's stretched. No, no, no, but I'm not asking about that. What did he say about the nondisclosure of the Burton letter? The nondisclosure of the Burton letter itself, he had an interview with the examiner during the prosecution of the 649. He was face-to-face with the examiner. He did not tell the examiner about the Burton letter or any of the other prior art that would have informed the examiner that you'd get low TSNAs. But what did he say as to why? I don't know that he was—if you're asking was he asked why, he didn't offer an explanation. He did not advise them. There were petitions to make—he was advised, though, there were two petitions to make special that were filed. For the first patent application, there was a petition to make special. For the second application, there was a petition to make special. He did testify, and Mr. Rivard testified, that he explained to STARS executives, including Mr. Williams, that when there's a petition to make special, you have a heightened duty, a heightened duty of care when your petition to make special— But basically you're saying nobody asked him why he didn't ask to have the Burton letter disclosed or disclosed himself. Only to the extent that he had opportunities to disclose it. He was certainly aware of it. But he didn't say—he didn't—he wasn't asked why not. But this goes to Mr. Williams' intent. When he was surprised by Mr. Rivard that there's a heightened duty of care with a petition to make special to let me know and tell the patent office about the prior art, he did not volunteer— No, no, I'm just trying to understand the facts. There is no specific testimony. He wasn't—he didn't testify about that. I believe that's right. Okay. Now, what about Mr. Del Mondo? He did testify, right? Right. And he was the fired lawyer, right? Yes. Right? So what did he say? That he didn't get to the point of making a decision about that, or what did he say about that? Right. His testimony was—he never got to the point where he resolved in his own mind whether it should be disclosed or not. It was a concern. There's an exhibit he writes, you know, important prior art concern that he acknowledged. That was a reference to Burton and what do we do about this. He also acknowledged that this was the closest prior art that he was aware of, and he had not— Is there evidence that he told the Starr executives that he had a concern about this? Yes. I mean, they knew he had a concern, and I think that's where Judge Garvis understood that, you know, people don't come in and confess that they do bad things in the ordinary course. Judge Garvis concluded that the reason that Mr. Del Mendo was terminated or replaced was in a sense to bury the— Okay. So he testified that he told the Starr executives about his concern before the time when he was terminated. Right. And then this is a lingering concern that he has, and he's replaced. Now, the other important point is that Mr. Del Mendo never actually spoke to Mr. Rivard. And so the concern never got from Mr. Del Mendo to Mr. Rivard, and frankly, the Burton letter disappears from the face of the earth. Okay. What about the Starr executives who were told about Del Mendo's concern? Did they testify? Mr. Perrito testified, and he never volunteered that he felt an obligation to make this decision. Was he asked about whether he made a decision about disclosure? Was he asked in black and white? Probably not. I mean, there's nothing to point to, but he certainly was aware of it, and he understood that it had not been disclosed. I mean, there are a lot of facts going on here. In these cases, it's always that the stuff complained about was not disclosed. So to prove and prove and prove and re-prove 18 different ways that it wasn't disclosed doesn't address the heart of the case. Right. The heart of the case is why not? What explanation was given, and what was the evidence to suggest that that explanation was not reasonable or fabricated or something like that? And it was not reasonable. Yeah, but where's the evidence? Well, the evidence starts at the beginning when the first thing they do is put into the provisional application. They say the prior art gives you high t-SNAs instead of low. And Judge Garbus was very specific. Yeah, but what's troubling is that the key witnesses weren't asked to explain why they didn't disclose it, which is sort of strange in a case where good faith explanation is so central to the outcome. Well, Mr. Del Mendo was asked, and then he was fired before he got to the point. But I think Judge Garbus questioned his credibility, rightfully so, when he writes in high and doesn't get to the bottom of it when he's got a letter that says low. But Mr. Del Mendo then rewrites the patent application. Instead of being up front and saying we made a mistake, Judge Garbus talked about they danced around. They never explained why they replaced the original statement that said high and took it out and said that the prior art doesn't depreciate. And then when we go to Mr. Rivard's involvement, nobody could argue about, by the time this got to the end, that everybody knew about the letter. And Judge Garbus went through the pages that we've already spoken about where he said there was no reasonable basis not to disclose the letter. You had five skilled patent lawyers who all had written this should be disclosed. And then there's nothing in the record to make any explanation as to why it wasn't disclosed. There's no memo to the file, anything of that sort. He talked about the incentive they had was a concern that if they submitted this in with a big red flag to the patent office, nothing could be worse for them. And they decided they would take their chances in the litigation where the burden of proofs are higher. If I could ask you, you referred a couple of times in your colloquy or your discussion with Judge Dyke to Mr. Del Mendo and his firm being taken off the prosecution and the prosecution being transferred to the Banner firm. Now, there were two explanations given for that in the testimony. One was that someone was upset about the way a particular attorney acted in his contact with an examiner. And the second point was that a senior attorney at the Chagrou firm had passed away. And those were the two explanations that were given. Now, did the district court judge say, I don't believe those explanations? I got the sense, and please correct me if I'm wrong, he never really said, I disbelieve those explanations. But there was sort of this light motif or innuendo, or you got the sense that he felt that they weren't correct. But I didn't see him saying, I disbelieve those. He doesn't specifically say, I disbelieve those specific explanations. But he does talk about that he didn't find credible the explanation and that there was a replacement. And we says the replacement was done to quarantine or to insulate or to engineer the separation. He's making positive, direct, express findings that I think are an express repudiation of the story that we're hearing from Stark. Well, we're talking about quarantining. We're saying quarantining the Banner firm. Right. But I think Judge Garvis clearly addressed head on. This was a major part of the trial. Clearly addressed head on what happened with the Burton letter and what happened with the shift and the change in firms. And he clearly assessed the credibility of the witnesses. And he walked through the story. And he basically said, I don't believe what they're saying. And the fact of the matter is the Burton letter did disappear. And the Burton letter did disappear for a number of years. And it was only when Reynolds uncovered it in third party discovery does it come up. And I think you have to ask yourself what better evidence could there be of intent when the letter is, you know, there right front and center and it's not disclosed. And the story that Judge Garvis talked about, you know, that he didn't buy the argument at all. He talks about this with credibility findings. He did not buy the argument at all that, well, it would have been too costly or it might have caused delay. I mean, there was an ongoing lawsuit that was already going on. They had asserted the first of the two patents. Asserting the second patent wouldn't have changed anything. And they never said that it would. And the cost of less than $1,000 and a few months delay in the prosecution, he said that's not plausible. And he said, when you look at this email string, and he heard from all the lawyers. I mean, all the lawyers involved testified. He had a chance to observe their credibility. He said this was not reasonable. This was not plausible. This was not good faith. And, you know, you can argue about maybe what happened at the beginning. But at the end, when it's all there, no disclosure. And he went through the reasons. He talked about, you know, I'm not going to repeat myself. But he had a reasonable basis to reach the result he did. And that doesn't mean that they haven't come forward with another story. But he had a chance to look these people in the eye to observe them. And he said, I don't, you know, I'm just not believing it. Who made the decision to switch law firms? The decision to start. I mean, that was a start. Which person? I believe it was Mr. Perito, who was the key. Perito? And did Del Mendo communicate with him about the Burton letter? I don't know that there's anything about whether Perito knew about the Burton letter specifically. But I think they all knew about it. And I think Judge Garvis. I mean, whether there's testimony I can point to. I mean, I would have thought that the key question here was whether Perito, in deciding to switch law firms, was doing it to conceal. Well, this was done when Mr. Williams. Wait. Was doing it to conceal the Burton letter or not. And what you're telling me is there's just nothing in the record in which Perito explains or addresses whether the Burton letter played a role in it. Well, I think Mr. Williams was part of this decision. Mr. Perito is his right-hand man. So certainly Mr. Williams knew about it. Mr. Perito, there's evidence about deceptive intent as far as Mr. Perito is concerned. Mr. Perito wrote a letter to the industry basically saying that we're going to try and cover what he was terming rudimentary heat exchangers, which was the very same prior art that we're talking about. There was a letter from Mr. McMillan, which was Trial Exhibit 239, which went to Mr. Perito and went to Mr. Williams. This is the letter that is quoted in Judge Garvis' decision where Mr. McMillan is talking about the fact that the prior art sometimes would give you low TSAs. And he said this raised an issue of novelty. And what could be more material than that whole issue? And Mr. Perito was aware of that. Mr. Williams was aware of that. And so, you know, and then Mr. Garvis, Mr. McMillan at the closing acknowledged that everybody knew. So they all knew that you could get low TSAs at least some of the time following the prior art. And so the notion that any of them are going to stand up here and profess innocence on this issue, that they weren't acting with deceptive intent, Judge Garvis had that opportunity and he wasn't buying the innocence. Let me ask you, I think you mentioned Mr. McMillan. He's the attorney at the Crowell firm, right? Yes. Now, is he the person who sent the email, I guess we're in this May, June of 2002 timeframe, where I guess Mr. Coe was involved and there's this question as to whether the document, the Burton letter is going to be disclosed. And basically, he kind of says, and correct me if I'm wrong, I think there was an email where he says, basically, you decide with the Banner people. Right. You decide with our people and the Banner people. Now, let me say, how, in what way, and it may well, but in what way, how does that suggest some kind of a conspiratorial intent or an improper intent with respect to it? I mean, he's saying, look, this has been brought to our attention. You decide with the Banner firm. And I think what it suggests is there was deceptive intent, and here's the reason. Because up until that point in time, all five lawyers that had been part of this decision-making process, including both Mr. Rivard and Mr. Hoscheit, had concluded that this should be disclosed. I mean, Mr. Rivard— Well, but you can have a change of opinions on something. And they never— So this morning on the jurisdictional issue in the case between the private party and the commission. So, I mean, there can be a change of view. That was a complete stop in the tracks of what was clearly a decision, we're going to disclose this. But for, you know, the only record is Mr. McMillan writes this email and says, I want you to decide it. And then after that, no disclosure. And the only explanation that was ever offered as to the no disclosure is the cost and the delay that would have been associated with that. And Judge Garvis specifically details his rejection of that, that it wasn't plausible. It was inconsistent with the, in a close case, we're going to make a disclosure. Yeah, but that was, it seems to me, necessarily influenced by his view that the change in law firms was designed to conceal the Burton Letter and the relationship that existed between the law firms sort of was designed to wall off the old firm. And those are key questions. And what I'm still struggling with is that apparently Williams and Perito were the ones who made this decision to switch law firms. And you're telling me, who called those people as witnesses? We called them, they presented them. But you never asked them when they were called as to whether the Burton Letter played a role in changing law firms? I don't believe that was asked. I don't think there's a question specifically on that. But look, Mr. Garvis, Judge Garvis below, there was a whole pattern of conduct here. They had numerous opportunities from the beginning of this process. Were they asked as to why they changed law firms? The only explanation, the only testimony was, you know, either somebody who grew up. Because of the death. Excuse me? Because of the death. Yes. I mean, we're not going to deny that. I think Judge Garvis heard that. I think nobody comes in and confesses. He found the whole thing suspicious. He didn't find it plausible that the way these files got transferred. Look, this is a document that was front and center on Mr. DelMendo's table, and then there's a new firm that comes in, and Mr. Rivard takes over the files, and the Burton Letter disappears. They were intermediate. There was another firm that was brought in. There was testimony from Mr. Flicker from the Paul Hastings firm, which was the firm of Mr. Perito, that he kind of, you know, organized, orchestrated this transfer. The file doesn't, the document doesn't get there, and it disappears. And Judge Garvis, he talks, he makes, he- I have a question, Mr. Kemp. Is it a question of it disappeared or it was in the file and nobody immediately found it? Well, Judge Garvis, while he went out of his way not to make a finding that he said anybody, you know, tampered with the file, I think the fair import, though, of his decision, he pointed out, because he asked to look at the file at the trial, the testimony from Mr. Rivard had been that, well, you know, he was looking at the section of the file that had the prior art in it. He wasn't looking at the section in the file that had the correspondence in it. The problem with that, which I think Judge Garvis struggled with, is if it had been in the correspondence part of the file, there would have been two holes punched in at the top. And when the document came out of the file, there were no two holes punched at the top, which made it, which showed that it was not in the correspondence file, to the extent that it had been where the prior art was located, which was a small stack of paper. All right, you know, I think he says it was highly suspicious. And did Rivard see it, or did Rivard see it before? I mean, nobody's ever going to know. I mean, Mr. Rivard said what he said. But the circumstances were still suspicious. And there was a basis to infer that this, with these law firms, the changing firms, that there was a disappearance of the letter and that Judge Garvis was reasonable to infer that. And if there was any doubt about that, when you get to the end of the day of reckoning, so to speak, where the letter shows up only because Reynolds uncovers it and they had no more choice in terms of dealing with it, everybody says disclose it. Mr. McMillan kind of calls a little bit of a halt to that. And then ultimately they don't disclose it, and there's no record made of any reasons why to disclose it. And Judge Garvis, you know, the cost and the delay arguments, he rejected it. He talks about it. He rejected it. It was not credible. It was not plausible. He makes a comment. He talks about the incentives. I mean, the Banner firm had been incentivized in terms of the patent prosecution efforts, and the Crawl and Warren firm on the litigation side had been incentivized. And so, you know, that was part of Judge Garvis' analysis that wasn't the only part, but those were other facts that entered into the mix. All right. We've given you an extra 20 minutes. I think we have to call a halt to it and have a rebuttal argument from Mr. Phillips. Thank you. Give you some additional time if you need it. Thank you, Your Honors. Let me try to clarify at least a portion of the record. Judge Dyke, you asked about Mr. Williams. Mr. Williams specifically testified that he had never seen the Burden letter. He did it, obviously. He called Burden and asked him to send the letter. He actually had never seen the letter. The first time he saw it was when he was being deposed. So the notion that somehow there's any evidence out there that he either appreciated the importance of this letter or acted in any way to nondisclose it, it's just there's no proof of that. What about Perito? With respect to Perito, again, there's no evidence that he knew about the Burden letter. But what there is evidence of is that he did make the decision to switch law firms, and he testified specifically on that issue. And he said, one, it was because there had been this hubbub with an examiner, with one of the Subaru partners, and two, that the senior partner who was involved in the case was very ill and the time had come to make a transition over. Was he asked whether the Burden letter played any role in switching? He never was asked that specific question. He was asked specifically, why did you make the decision to switch firms? And he testified forthrightly as to why he made that decision. I thought there was, Mr. Kaplan suggested that there was evidence that Mr. Delmando had concerns about the Burden letter and that he had discussed that with Starr executives. I don't know about any evidence with respect to Starr executives. Delmando did review the Burden letter, and he did talk to Burden. And this is on page 11 of our brief. What did he speak to Starr about? I don't recall any testimony specifically that he spoke to anybody at Starr about other than he might have talked about the substance of the Burden letter, but not as a concern of the prior art. Because what he did is he went back and he asked Burden what he knew. And Burden said, look, I'm not an expert in flu-cured tobacco. I don't really know much about China. I don't know how they cured it in that particular case. I just had a few cigarettes and I tested it. And so he said, and Delmando said, well, this doesn't look like anything that's worth revealing under those circumstances. And then he went forward and he filed both the provisional and the other application. And then there was a transition over. The suggestion that somehow that letter didn't go as part of the transition is completely contradicted by the evidence. I think it would be sort of interesting to know whether there was any evidence that Delmando communicated any of these concerns to the Starr executives. Well, and again, they have the burden of proof to prove by closing evidence. No, no, I don't mean outside the record. I mean in the record. Right, and they had a full and fair opportunity to ask. No, but the question is whether there's anything in this record in which they were asked. I don't recall anything in this record with respect to an exchange specifically between Delmando and anybody about the Burden letter, other than as a concept. But should I disclose the Burden letter? No, that's a situation where the Starr people are going to completely delegate that responsibility to their lawyer because he's the one who has to make the judgment on the question of materiality. They change lawyers. That letter goes over in the file. There's no question about that. It's in exactly the same color as it was in the Subaru file, so you know it was sent over with those files. It was in a provisional application, which had already passed being relevant, so it got filed away and nobody looked at it anymore. It shows up, obviously, as part of the discovery process. Reynolds makes a big fuss about how they had to go to Burden to get this letter. The truth is they would have gotten this letter from the Banner files if they had asked for the provisional application because they would have gone with that and it wouldn't have been a big deal. It just happens that a week before that they had ended up with this third-party process, so they get it. But the fundamental point here is he said the district judge sprinkles intent. He sprinkles language of intent, but he doesn't make the rigorous kinds of findings it seems to me you have to make in a case like this. When the burden is to show by clear and convincing evidence that you have intended to deceive the PTO by withholding material information. At a minimum, we were entitled to have the good faith explanations that were put forward by these law firms, carefully scrutinized and some kind of a finding with respect to their credibility before you end up writing an opinion that candidly pillories them for their conduct in this particular case. And I go back to where I started. The central point of this pivot is the transfer over from one firm to another where the testimony of the senior partner in the receiving firm, uncontradicted, never mentioned in the district court's opinion is I sat down, these are people I've known a long time, I've litigated with them, I took the information from them and we proceeded to evaluate it. This is not the stuff of inequitable conduct. This is not the stuff of intent to deceive anyone. The findings of the district court candidly are clearly erroneous and this court should reverse. If there are no other questions. Just like I did have one other thing I wanted to just say real quickly since I wasn't completely out of my time, which is you asked about evidence beyond the Peel application and there are the R.J. Reynolds interrogatories and the Brown Barn and there's specific revelations, disclosures there of TSNAs and the prior art of exchanges that are down in the very small numbers as well. So it's not just the Peel application. There's plenty of evidence in this record before the PTO, certainly by the time of the second application of that kind of outcome. All right, well, the argument is concluded. We'll take the case under advisement, but we're requesting from both counsel a letter of brief not exceeding ten double-spaced pages on the factual guts particularly with regard to the position and activities of Del Mundo and the others who've been mentioned here so we can trace the chain of what did each of these people say and where do we find it in the record? There's obviously a great interest on our part in understanding exactly what the evidence was so we can compare the evidence, the actual words of testimony and all these particulars with the findings that the district judge made which explicitly or implicitly have to rest on those bits of testimony. Is that clear enough, Mr. Kaplan? When would you like that? Ten days. All right, the case is submitted.